*Berquan Carroll v. State of Maryland*, No. 1818, September Term, 2024. Opinion by Eyler, J. Filed July 8, 2026.

**LEGAL SUFFICIENCY OF ACCOMPLICE LIABILITY EVIDENCE - - DRIVER OF VEHICLE INVOLVED IN HOMICIDE - - INORDINATE DELAY OF TRIAL UNDER *HICKS V. STATE* - - DELAY IN TRIAL CAUSED BY CIRCUMSTANCE UNRELATED TO DECISION TO GRANT POSTPONEMENT.**

The appellant was one of four men in three vehicles who met up at a surface parking lot in Hagerstown. They all got into one of the men's cars and drove around for an hour until they saw a vehicle driven by a particular person, who became the victim. They followed him until he parked on a side street. They then drove directly back to their meeting place, got out of the vehicle, and all entered the vehicle the appellant had brought, with the appellant in the driver's seat. The vehicle the appellant had brought was a Honda that had no front license plate, had a rear Pennsylvania license plate that was not registered to any vehicle and therefore could not be traced, and was not associated with the appellant or anyone. The appellant drove the Honda back to the street the victim had turned on. The victim was sitting in his parked car. The appellant drove the Honda parallel to and slightly beyond the victim's car and then brought it to a stop. Two backseat passengers leaned far out of the rear windows and shot at the victim, who tried to run away. Thirty-two shots were fired, five of which hit the victim, who was killed. As soon as the shooting stopped, the appellant drove the Honda away. After dropping off one man, the appellant returned to the surface parking lot and seemed to remove the rear license plate from the Honda. He left in another of the men's cars, and the last of the four men drove off in his own car. The Honda was left abandoned at the parking lot. When the police found it, there were no license plates on it.

The appellant was charged with murder and other related crimes as an accomplice and a co-conspirator. The initial trial date was set in for one day. That date was postponed for good cause by the administrative judge because the case would require more than one day to try. The postponement was to a date nine months after the initial trial date and six months after the appellant's Hicks date. Very soon after the postponement of the initial trial date, the appellant filed a not criminally responsible plea, a statement that he was not competent to stand trial, and a request for a competency evaluation. Over a period of months, competency and mental health evaluations were performed by the Maryland Department of Health. The appellant requested a competency hearing. Before it was scheduled, he and the State agreed to postpone the trial date. Approximately four and a half months after the first postponed trial date, the appellant withdrew the issue of his competency. At the appellant's trial, he moved for judgment on the ground that the evidence did not show that he had the intent to kill the victim, which was required for a finding of guilt on the murder charges as an accomplice or a co-conspirator. The motions were denied, and the appellant was found guilty of murder and all related charges but one. At various times, the appellant filed motions to dismiss on the ground that his right to a

speedy trial under Maryland statute and rule, as interpreted by *State v. Hicks*, 285 Md. 310 (1979), had been violated. The court denied the motions. The appellant noted a timely appeal, asserting that the evidence was legally insufficient to support his convictions on all but one count and that the charges should have been dismissed based on Hicks.

*Held*: Judgments affirmed. To be criminally liable as a principal in the second degree, i.e., an aider or abettor, otherwise referred to as an accomplice, there must be a finding that the accomplice shared a common criminal intent with the principal offender. Similarly, a co-conspirator must be proven to have entered into an agreement with the other conspirators with the intent that the criminal objective of the conspiracy be achieved. The appellant took the position below, and argued on appeal, that the evidence was legally insufficient to show that he shared an intent to kill the victim. Specifically, the evidence did not show that he knew that the backseat passengers were going to shoot the victim, and that they were going to do so with the intent to kill him. Intent is almost always proven by circumstantial evidence. There was significant circumstantial evidence in this case from which reasonable jurors could find that the appellant shared the lethal intent of the backseat passengers who shot and killed the victim. The appellant brought a vehicle to the meet up that was not capable of being traced. After one of the other men drove the men around Hagerstown until they located the victim, they returned to the meet up spot and all got in the appellant's untraceable Honda. The appellant drove the Honda to the victim's location, slowed down, and then brought the Honda to a stop, at which time the shooting took place. The appellant's clear purpose in bringing the Honda to a stop was to allow the shooters time to aim and successfully shoot at the victim. After the shooting, the appellant drove the men away and back to the meet up location, where he abandoned the Honda. The appellant acted together, in a coordinated fashion, with the shooters to locate the victim and return to the victim's location and shoot him. The circumstantial evidence of intent to kill on the appellant's part was ample.

The appellant's initial trial date was postponed beyond his Hicks date for good cause, by the administrative judge, because it had been set in for only one trial day and was going to require more than one day to try. The appellant's first trial date after the initial trial date was six months past his Hicks date. Under ordinary circumstances, that may have constituted an inordinate delay in the trial. However, less than one month after the initial postponement, the appellant filed suggestions of incompetency. The effect of his filings was that he could not be tried until the issue of his competency to stand trial was fully litigated, because to try him before there was a finding of competency would violate his due process rights. Before the issue of competency was litigated, the parties agreed to postpone the newly set trial date. The appellant eventually was tried on a date after he had withdrawn the issue of competency. Because incompetency had not been determined, it was impossible to try the appellant during the entire period of delay from the initial trial date to the first postponed trial date; therefore, if that was an inordinate delay, it did not result from the court's postponement but from the appellant's unresolved suggestion of incompetency.

REPORTED

IN THE APPELLATE COURT

OF MARYLAND

No. 1818

September Term, 2024

_____

BERQUAN CARROLL

v.

STATE OF MARYLAND

_____

Shaw,
Zic,
Eyler, Deborah S.,
    (Senior Judge, Specially Assigned),

JJ.

_____

Opinion by Eyler, Deborah S., J.

_____

Filed: July 8, 2026

Pursuant to the Maryland Uniform Electronic Legal
Materials Act (§§ 10-1601 et seq. of the State
Government Article) this document is authentic.



Gregory Hilton, Clerk

A jury in the Circuit Court for Washington County convicted Berquan Carroll, the appellant, of first-degree murder and other crimes. The court sentenced him to life imprisonment, plus five years. Carroll appeals, presenting three questions for review, which we rephrase:

> I. Was the evidence legally insufficient to sustain all but one of his convictions?
>
> II. Did the trial court err by denying his motion to dismiss the charges for violation of the Maryland Hicks law?
>
> III. Was he denied his right to be present during a critical stage of the proceedings when a scheduling conference went forward without him?

For the following reasons, we shall affirm the judgments of the circuit court.

## FACTS AND PROCEEDINGS

Jermaine Reed, II, was killed in a targeted "drive-by" shooting on a residential street in Hagerstown, Maryland. The shooters - - Kyeron Cottingham and Kevin Nunn - - were backseat passengers in a Honda Accord ("the Honda"). Carroll was driving the Honda when the shooting was carried out.

Surveillance cameras around Hagerstown captured the movements of those three men and a fourth, Bradley Walker, and their vehicles for about an hour before the shooting and in its immediate aftermath. Officers with the Hagerstown City Police ("HCP") compiled that footage into a "stitch video" that was moved into evidence at Carroll's four-day jury trial. Based primarily on the stitch video, Carroll agrees that the State proved the following facts beyond a reasonable doubt.

On March 17, 2022, just before 3 p.m., Carroll, Cottingham, Nunn, and Walker left City Park in Hagerstown in a convoy. Carroll was driving the Honda, Nunn was driving a Lincoln MKC ("the Lincoln"), in which Cottingham and a large dog were riding, and Walker was driving a Chevy Malibu ("the Chevy"). The three vehicles converged and parked on a small surface lot behind a multi-story parking deck. Carroll and Walker got out of their vehicles and joined Cottingham and Nunn in the Lincoln. The Honda and the Chevy were left at the surface lot.

Nunn and the occupants of the Lincoln drove around Hagerstown for twenty minutes and then stopped at the minimart of a Sheetz gas station. Carroll and Nunn entered the minimart and bought snacks using Carroll's government-issued electronic benefits transfer ("EBT") card. They got back in the Lincoln and Nunn then continued driving around town.

While the Lincoln was stopped at an intersection, the men saw Reed in his car at the other side of the intersection, facing them. Reed turned right. Nunn, who had been driving carefully until then, pulled around a school bus and made a left turn, following Reed's vehicle. He continued to follow Reed until Reed turned right onto Alexander Street and parked his car on the street. Nunn drove past Alexander Street, returning directly to the surface parking lot where the four men had met up. All the men and the dog got out of the Lincoln and into the Honda, with Carroll in the driver's seat. Walker was in the front passenger seat and Cottingham and Nunn (and the dog) were in the back passenger seats.

Carroll drove straight back to Alexander Street, this time turning onto that street. Reed was sitting in his parked car, with the door open.[1] Carroll slowed down and drove parallel to, and slightly beyond, Reed's parked car. He brought the Honda to a stop for ten seconds. As he did so, two things happened. Cottingham and Nunn, holding guns, leaned their upper bodies far out of the rear windows of the Honda and began shooting at Reed; and Reed jumped out of his car and ran away from the Honda, in the direction from which the Honda had entered Alexander Street. In total, Cottingham and Nunn fired thirty-two shots at Reed, hitting him five times, including in the neck and back. Reed collapsed on the sidewalk about five car lengths behind the Honda. He later was transported to a hospital where he was pronounced dead.

When the shooting stopped, Carroll sped away. He drove to an alley, where Cottingham and the dog got out, and then returned to the surface parking lot where the Lincoln and the Chevy remained. Carroll got out of the Honda, walked to its rear, and appeared to remove its back license plate.[2] Nunn exited the back seat of the Honda, removed his shirt, got in the Lincoln, and drove off. Carroll and Walker got in the Chevy and drove away. The Honda was left abandoned at the surface parking lot.

Later that same day, after the shooting had been reported, the police found the abandoned Honda. It had no license plates on it. Surveillance video showed that, when Carroll was driving the Honda earlier that day, it had had a rear Pennsylvania license plate.

---

[1] There was testimony at trial that Reed tended to sit outside in his car for long stretches of time.

[2] The Honda did not have a front license plate.

The HCP determined that that license plate had never been registered to a vehicle. In addition, the police determined that the Honda was not registered to Carroll or anyone.

We will supplement these facts as necessary to our discussion of the issues.

**DISCUSSION**

**I.**

The jury convicted Carroll of first-degree murder, second-degree murder, first-degree assault, second-degree assault, recklessly discharging a firearm from a motor vehicle, using a firearm in the commission of a crime of violence, and conspiracy to commit each of those crimes. Carroll contends the evidence was legally insufficient to support those convictions.[3] Specifically, he maintains that from the evidence adduced, a rational juror could not find beyond a reasonable doubt that, acting as an accomplice or a co-conspirator, he "*intended* for Reed to be killed, seriously injured, threatened with a firearm, or even merely assaulted[.]" (Emphasis in Carroll's brief.) He further asserts that, because the evidence did not support convictions for murder or assault, it also did not support convictions for use of a firearm in the commission of those crimes.

**a.**

We review the sufficiency of the evidence for whether "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *State v.*

---

[3] Carroll also was convicted of transporting a firearm in a vehicle. Because the evidence showed that, after the shooting, he drove the Honda with knowledge of the presence of at least two firearms inside it, he concedes the evidence was legally sufficient to convict him of that crime.

Carroll was acquitted of wearing, carrying, and transporting a firearm on his person.

-4-

*McGagh*, 472 Md. 168, 194 (2021) (quoting *State v. Manion*, 442 Md. 419, 430 (2015), in turn quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original)). The question is not whether we, as a reviewing court, would have found that the evidence at trial established guilt beyond a reasonable doubt; rather, it is "whether the verdict was supported by sufficient evidence, direct or circumstantial, which could fairly convince a trier of fact of the defendant's guilt of the offenses charged beyond a reasonable doubt." *Id*. (quoting *Taylor v. State*, 346 Md. 452, 457 (1997)).

The standard of review for sufficiency of the evidence "applies to all criminal cases, regardless of whether the conviction rests upon direct evidence, a mixture of direct and circumstantial, or circumstantial evidence alone." *Smith v. State*, 415 Md. 174, 185 (2010) (citing *State v. Smith*, 374 Md. 527, 534 (2003)). "Maryland has long held that there is no difference between direct and circumstantial evidence." *Palmer v. State*, 266 Md. App. 693, 708 (2025) (citation omitted) (quoting *Jensen v. State*, 127 Md. App. 103, 117 (1999)). Circumstantial evidence alone may sustain a conviction, "provided the circumstances support rational inferences from which the trier of fact could be convinced beyond a reasonable doubt of the guilt of the accused." *Id*. (citation omitted) (quoting *Handy v. State*, 175 Md. App. 538, 562 (2007)). *See also Hebron v. State*, 331 Md. 219, 228 (1993) ("A conviction may be sustained on the basis of a single strand of circumstantial evidence or successive links of circumstantial evidence."). Such inferences, however, "must rest upon more than mere speculation or conjecture." *Smith*, 415 Md. at 185 (citing *Bible v. State*, 411 Md. 138, 157 (2009)). We view any such "reasonable inferences deducible from the evidence in a light most favorable to the State." *Id*. at 186.

**b**.

The State based its prosecution of Carroll on two theories: accomplice liability and conspiracy. It sought to prove that Carroll aided and abetted the actual shooters, Nunn and Cottingham, by driving them to the scene "with the intent to make the crime[s] happen" and that he "knowingly aided, counseled, commanded, or encouraged the commission of the crime[s.]" Maryland Criminal Pattern Jury Instructions ("MPJI-Cr") 6:00. It also sought to prove that Carroll conspired with Nunn and Cottingham to kill Reed.

"Under Maryland law, one may commit an offense as either a principal in the first degree[] or a principal in the second degree[.]" *Evans v. State*, 382 Md. 248, 263 n.11 (2004). "A first degree principal is the actual perpetrator of the crime." *Owens v. State*, 161 Md. App. 91, 99 (2005). "A second degree principal must be either actually or constructively present at the commission of [the] criminal offense and aid, counsel, command, or encourage the principal in the first degree in the commission of that offense." *State v. Raines*, 326 Md. 582, 593 (1992). "The activity of a principal in the second degree is generally referred to as aiding and abetting, and the aider or abettor is usually called an accomplice." *Owens*, 161 Md. App. at 99 (quoting MPJI-Cr 6:01 cmt. (collecting authorities)). *See also Diggs & Allen v. State*, 213 Md. App. 28, 85 (2013).

Proof of intent is essential to accomplice liability:

> "To be guilty as a principal in the second degree, a criminal intent is necessary." "Aid or encouragement to another who is actually perpetrating a felony will not make the aider or encourager guilty of the crime if it is rendered without mens rea. It is without mens rea if the giver does not know or have reason to know of the criminal intention of the other. In general it is the abettor's state of mind rather than the state of mind of the perpetrator which determines the abettor's guilt or innocence. 'Intention' includes not

only the purpose in mind but also such results as are known to be substantially certain to follow."

"To be an accomplice a person must participate in the commission of a crime knowingly, voluntarily, and with common criminal intent with the principal offender, or must in some way advocate or encourage the commission of the crime."

*State v. Williams*, 397 Md. 172, 194-95 (2007) (cleaned up) (quoting *Raines*, 326 Md. at 596-97), *abrogated on other grounds by Price v. State*, 405 Md. 10 (2008). *See also Silva v. State*, 422 Md. 17, 28 (2011).

"T[o] prove a criminal conspiracy, the State must establish that the alleged conspirator 'agreed with at least one other person to commit' the crime that was the object of the conspiracy and that he 'entered into the agreement with the intent' that that criminal objective be achieved." *McClurkin v. State*, 222 Md. App. 461, 486 (2015) (quoting MPJI-Cr 4:08).

"'Intent is rarely shown by direct evidence.' . . . Rather, intent is often 'shown by circumstantial evidence, that is facts that permit a reasonable inference that the intent existed.'" *Johnson v. State*, 269 Md. App. 208, 247 (2026) (quoting *Fetrow v. State*, 156 Md. App. 675, 691-92 (2004)).

**c.**

As noted, Carroll contends that evidence of intent was lacking and, therefore, rational jurors could not find beyond a reasonable doubt that he acted as an accomplice or conspirator in any of the crimes against Reed. In advancing that contention, he relies primarily on *Commonwealth v. Gonzalez*, 56 N.E.3d 1271 (Mass. 2016), a decision of the Massachusetts Supreme Judicial Court.

In *Gonzalez*, closed circuit television evidence showed that the victim was shot and killed while sitting in his stopped vehicle at an intersection. Thirty seconds earlier, a Dodge Caravan had stopped briefly on Haverhill Street at the same intersection. Four men got out, crossed the street, and approached the victim's vehicle from behind, two on the right and two on the left. They fired fifteen shots from two handguns, killing the victim, and then fled on foot. In the meantime, immediately after dropping the four men off, the Dodge Caravan drove straight on Haverhill Street, then turned right onto a side street. It made a U-turn, returned to Haverhill Street, then turned right, continuing in the same direction it had been traveling before.

The evidence also showed that the defendant and her boyfriend had had altercations with the victim in the days before the shooting, including a physical fight in which the boyfriend lost a tooth. The altercations stemmed from the victim's failure to pay the defendant the full sales price for a car she had sold him. The evidence showed that the defendant's mother owned a Dodge Caravan that looked like the one from which the four men alighted, and that the defendant often drove that vehicle, but others did too. It further showed that the defendant had made calls to men thought to be involved in the shooting in the hours leading up to it; however, her boyfriend, also involved, had access to and frequently used her phone. When interviewed by the police, the defendant denied being in the vicinity of the shooting or having anything to do with it.

The government theorized that the defendant was driving the Dodge Caravan that dropped the shooters off near the victim's vehicle right before the shooting. The defendant was convicted of premeditated murder based on accomplice liability. The Supreme Judicial

Court reversed. It determined, first, that the evidence was legally insufficient to prove criminal agency, i.e., that the defendant was the driver of the Dodge Caravan that transported the four men to the intersection where the victim was located. It reasoned that, although the evidence adequately showed that the defendant's mother's Dodge Caravan was the vehicle from which the men were dropped off and that the defendant's phone was used to communicate among them, without resorting to layers of questionable inferences amounting to speculation, that evidence was insufficient to show that the defendant was the person driving the Caravan and speaking on the phone.

Second, and pertinent to Carroll's argument, the court concluded that, even if the evidence was sufficient to show that the defendant was driving the Caravan, it was insufficient to prove that she knew the men she dropped off intended to kill the victim and that she shared their lethal intent. The court emphasized that circumstantial evidence sufficient to support a finding of intent "may not consist solely of a showing that the defendant was present when the crime was committed, even if that showing is supplemented by evidence that the defendant knew about the crime in advance." *Id*. at 1286 (cleaned up). "Rather, there must be some additional proof that the defendant consciously acted together with the principals before or during the crime with the intent of making the crime succeed." *Id*. (cleaned up). The court rejected reasons the government gave to support a finding of intent, including that the defendant had turned onto the side street because she knew the shooting was about to happen and planned to return to pick the men up (which was inconsistent with her continuing to travel in a direction away from the shooting). It gave as examples of evidence that would be sufficient to show such an intent

-9-

incriminating statements by a defendant, proof that the defendant brought the lethal weapon to the scene of the crime, or proof that the defendant was aware of the perpetrators' lethal intent *and* took some step to help carry out that intent. No such evidence was adduced. The court observed that the government's evidence consisted primarily of motive, which is not a substitution for intent.

The State relies upon our decision in *Cooley v. State*, 157 Md. App. 101 (2004), *rev'd on other grounds*, 385 Md. 165 (2005), to argue that the evidence was legally sufficient to show intent to kill on Carroll's part. There, codefendants Gibson and Cooley were tried jointly in the shooting death of the victim. Gibson was convicted of first-degree murder and firearm crimes, and Cooley was convicted of second-degree murder and firearm crimes. According to Terrell, a friend of the victim, just before the shooting the victim told drug users in the area not to purchase drugs from Cooley and his companions. Thereafter, as Terrell and the victim were walking down the street, a vehicle driven by Cooley, with Gibson in the front passenger seat, pulled around the corner and stopped. Gibson got out, walked up to Terrell and the victim, asked the victim if he had "a lot of big words[,]" and began shooting. *Id*. at 106-07. Gibson got back in the vehicle with Cooley, and Cooley drove off. On appeal, we held that the evidence that Cooley drove "the shooter to the murder scene, and drove the shooter away after the shooting, was sufficient to establish that Cooley participated in the murder." *Id*. at 117.

Carroll argues that the holding in *Cooley* on the sufficiency of the evidence of intent is *dicta* that should not be credited because our Supreme Court reversed on another issue. Disagreeing with our Court, the Supreme Court held that the trial court erred by failing to

-10-

exercise any discretion to rule on a defense mistrial motion. The motion was made when, after Terrell testified, court security personnel escorted him from the courtroom. The defendants argued that the jury would have viewed Terrell negatively after that happened. The Supreme Court reversed the convictions and remanded for further proceedings in the circuit court, which could include a new trial. Significant to Carroll's argument, had the Supreme Court considered the evidence adduced at trial legally insufficient to support Cooley's convictions, it would have flatly reversed them, not remanded for further proceedings. Accordingly, the Supreme Court's decision in *Cooley* implicitly upheld this Court's determination that the evidence was sufficient to support Cooley's convictions.[4]

We return to the case at bar. In *Cooley*, Cooley drove Gibson to the victim's location, let him out of the car, was present when the shots were fired, and then drove Gibson away after the shooting. Evidence of that set of events permitted a rational inference that Cooley knew that Gibson intended to shoot the victim and aided him in doing so, with a shared intent that the victim be killed. By contrast, in *Gonzalez*, the evidence was not even sufficient to show that the defendant was the person driving the vehicle that dropped off the shooters right before the shooting took place. Even if she was, she drove off before

---

[4] In addition, as Carroll acknowledges, we need not be bound by the authority of *Cooley* to be persuaded by its reasoning. Of course, the out-of-state authority Carroll relies upon, *see* n.5 *infra*, is non-binding.

-11-

the shooting happened, undermining an inference that she knew the shooting was going to take place, much less that she shared an intent to kill the victim with the shooters.[5]

Carroll asserts that an inference drawn from his driving Cottingham and Nunn to Reed's location that he knew that Cottingham and Nunn were armed or shared their intent to kill or seriously injure Reed is merely conjecture. We disagree. The stitch video showed not only that Carroll drove Cottingham and Nunn to Reed's location but also that he positioned the Honda slightly in front of Reed's car, the best location for the rear passengers to have Reed in their sightline if they leaned out the windows. Once so positioned, Carroll

---

[5] Carroll also relies on other out-of-state and federal cases, all of which are distinguishable on their facts. In *Commonwealth v. Fields*, 333 A.2d 745 (Pa. 1975), two individuals approached a murder victim on foot, and one man shot him five times. The Supreme Court of Pennsylvania held that the evidence was insufficient to convict the second man as an accomplice.

In *State v. Asaeli*, 208 P.3d 1136 (Wash. Ct. App. 2009), three men were charged with murder and tried together in relation to a fatal shooting. One of those defendants drove the other two defendants to the park where the shooting later occurred but was not nearby when one of the other defendants fatally shot the victim. On that record, the court held that the defendant's mere presence at the scene did not show that he was complicit in a plan to shoot and kill the victim.

In *Wyatt v. State*, 367 S.W.3d 337 (Tex. Ct. App. 2012), the Court of Appeals of Texas held that the evidence was legally insufficient to convict a getaway driver of aggravated robbery of a bank because there was no evidence he knew that the principal was armed. The United States Court of Appeals for the Ninth Circuit reached the same result in *United States v. Dinkane*, 17 F.3d 1192 (9th Cir. 1994), concluding that the evidence was legally sufficient to convict a getaway driver of unarmed bank robbery, but not of armed bank robbery.

In *Fields* and *Asaeli*, the defendants were present and linked to the shooter, but there was no evidence that they facilitated the shooting. In *Wyatt* and *Dinkane*, the defendants were outside of the bank while their alleged accomplices committed the armed robberies, whereas here Carroll drove his accomplices to the scene of the crime and remained with them, aiding the commission of the crime, until its competition.

-12-

stopped the Honda altogether for the entirety of the shooting. There would have been no reason for him to do so had he not known that the passengers were going to shoot Reed and needed the Honda to be still in order to aim their firearms in his direction and hit him. Jurors rationally could infer from this evidence that Carroll knew of, and shared, his rear passengers' lethal intent toward Reed and aided them in carrying it out. The evidence in the case at bar is far stronger in this regard than the evidence in *Cooley*. The same evidence was sufficient to support a reasonable inference that Carroll conspired with Nunn and Cottingham with the intent that the murder be accomplished.

In addition to the above, the stitch video established that, beginning about an hour before the shooting, Carroll and the other three men acted in concert, first meeting at the surface parking lot and all getting into Nunn's Lincoln. The car Carroll brought to the meet-up had no front license plate and bore a rear license plate that was not registered to any of the men (or anyone at all), making it untraceable. Carroll spent the next hour as a passenger in the Lincoln as the men drove around Hagerstown. Upon seeing Reed and following him to the road where he parked, the men quickly returned to the surface parking lot where they exited the Lincoln and climbed into the untraceable Honda, with Carroll behind the wheel. Carroll drove the three men directly back to Alexander Street where, as explained above, he positioned the Honda to facilitate the shooting. Immediately after Reed collapsed from his injuries, Carroll began driving again, fleeing the scene of the shooting. As before, he drove directly back to the surface lot where the other two cars were parked, making only one brief stop to let Cottingham and his dog out of the vehicle. At the lot, Carroll

immediately removed the license plate from the rear of the Honda and then left with Walker, abandoning the Honda.

The evidence recounted above showed that the group of four men acted together to find Reed, follow him, return to their meet-up site to retrieve an untraceable vehicle, and return to Reed's location in that vehicle, with Carroll at the wheel, to shoot Reed with lethal force. From this evidence, rational jurors reasonably could infer that Carroll and at least Nunn and Cottingham agreed to commit the charged crimes and that Carroll acted as an accessory, with a shared intent for Reed to be killed. Given that the evidence, direct and circumstantial, permitted a rational inference of an agreement to kill Reed, and that Carroll shared Nunn's and Cottingham's lethal intent and knowingly aided them in carrying out Reed's murder, the evidence was legally sufficient to support all of Carroll's convictions.

**II.**

Carroll contends the circuit court erred by denying his motions to dismiss the criminal information for violations of Rule 4-271 and Md. Code (2001, 2018 Repl. Vol.), § 6-103 of the Criminal Procedure Article ("CP"), known familiarly as the "Hicks rule." *State v. Hicks*, 285 Md. 310 (1979). Specifically, he argues that the critical postponement of his trial date caused an inordinate delay in his being brought to trial.

**a.**

Under *Hicks*, a criminal defendant's trial must begin no later than 180 days after the first appearance of counsel or the defendant before the circuit court, whichever happens first. *Tunnell v. State*, 466 Md. 565, 569 (2020). The target date, 180 days after the first appearance, is referred to as the "Hicks date." *Id*. Absent the defendant's consent to a trial

date beyond that deadline, a continuance beyond the Hicks date may only be had for good cause, as authorized by the administrative judge of the circuit court, or his or her designee. *Id.* at 571. If a trial commences beyond the Hicks date without a showing of good cause, the charges must be dismissed with prejudice. *Id.*

"The critical determination for appellate review is the postponement that extends the trial date beyond the Hicks date[.]" *Id.* at 589. We review that decision in two steps: "(1) Was there 'good cause' for the administrative judge to grant a postponement of the scheduled trial date? (2) Was there an inordinate delay from the scheduled trial date to the new trial date in commencing the trial?" *Id.* Both determinations are reviewed for abuse of discretion. *Id.*

**b.**

The parties agree about the pertinent dates. The shooting occurred on March 17, 2022. On May 13, 2022, the State charged Carroll by criminal information. His court-appointed attorney made his initial appearance on May 31, 2022. Consequently, Carroll's Hicks date was November 27, 2022.

On June 3, 2022, the circuit court assignment office scheduled Carroll for a one-day jury trial on August 25, 2022, more than three months before his Hicks date. Soon thereafter, Carroll's lawyer requested a scheduling conference.

On July 26, 2022, a scheduling conference was held before the administrative judge. The conference was in-chambers and not on the record. At the conference, the administrative judge decided to postpone the August 25, 2022 trial date. Later that same day, the administrative judge issued an order stating, in pertinent part:

This case is presently scheduled for a Jury trial on August 25, 2022 at 9:30 a.m., this matter is hereby CONTINUED, with good cause having been found, and shall be rescheduled . . . [for] a five-day **JURY** trial [from] **May 22, 2023 through May 26, 2023**[.]

(Emphasis in original.) The new trial date was 270 days after Carroll's original trial date and 176 days past his Hicks date. Accordingly, for our purposes, the critical postponement happened on July 26, 2022.

From the date of his arrest, Carroll was detained pending trial. At the same time that his trial date was postponed, he also was communicating with his lawyer, and with the court, about his competency to stand trial. On August 8, 2022, Carroll mailed a letter to the administrative judge asking him to order a competency evaluation. On August 15, 2022, before that letter was received, Carroll's lawyer formally entered a plea of not criminally responsible ("NCR") and incompetency to stand trial and filed a motion for a competency evaluation. That same day, the court issued an order consistent with CP §§ 3-105[6] and 3-111,[7] directing the Maryland Department of Health and Mental Hygiene, now known as the Maryland Department of Health ("MDH"), to examine Carroll to determine his competency to stand trial and to assess his criminal responsibility at the time he allegedly

---

[6] CP § 3-105(a) permits the circuit court to order MDH to examine a defendant to determine if he or she is competent to stand trial. The report ordinarily shall issue within seven days, unless extended for good cause shown. That target date is inapplicable when, as here, the defendant also has entered an NCR plea. CP § 3-105(d)(2).

[7] CP § 3-111 applies when a defendant enters an NCR plea. It permits the circuit court to order MDH to examine the defendant both to determine if he or she was not criminally responsible and to determine competency to stand trial. CP § 3-111(a). That report should be completed within sixty days after the order issues unless extended by the court for good cause shown. CP § 3-111(c).

committed the offenses. The next day, August 16, 2022, Carroll's letter to the administrative judge was received and docketed.

On October 12, 2022, MDH issued a report finding Carroll competent to stand trial. On February 21, 2023, MDH issued a second report, finding that Carroll remained competent to stand trial and that he had been criminally responsible at the time of the alleged crimes.

One week later, Carroll's lawyer requested a status conference. He advised the court that the trial date remained set for May 22, 2023, but that, due to a conflict, new defense counsel would be taking over the case and that a "likely contested competency hearing needs to be set." New counsel entered her appearance that same day. She filed omnibus motions including a motion to dismiss for violation of Carroll's right to a speedy trial and for a Hicks violation.

On March 20, 2023, the court issued an order granting the request for a competency hearing. Four days later, the court held an in-chambers, off-the-record status conference. On May 16, 2023, with the consent of both parties, the administrative judge issued an order continuing the May 22, 2023 trial date so the issue of Carroll's competency could be litigated. A subsequent scheduling order scheduled a contested competency hearing for October 11, 2023, and a jury trial for December 4-8, 2023.

Five days before the scheduled competency hearing, Carroll, through counsel, withdrew his motion for a competency evaluation. Because of another change in defense counsel, Carroll moved for a continuance of his December 2023 jury trial, which was postponed until July 29, 2024, for good cause.

On April 4, 2024, the court held a hearing, at which Carroll testified, on his pending motion to dismiss the charges against him for violation of his federal constitutional speedy trial rights and for violation of Hicks. Carroll argued at the hearing that the postponement of his trial date from August 2022 until May 2023 was an inordinate delay requiring dismissal. The court denied the motion, reasoning, as pertinent, that Carroll's August 2022 suggestion of incompetency tolled the Hicks clock, which did not restart until October 2023, when Carroll withdrew his competency motion, making the July 2022 continuance "irrelevant[.]"[8]

Carroll renewed his Hicks motion ten days before trial, arguing that the postponement of his case "from 2022 [until the] ultimate trial in 2024 was an inordinate delay without good cause." After he was convicted, the court held a hearing on the renewed motion, which Carroll had since supplemented. Carroll testified at that hearing that he first learned that his August 2022 trial date had been continued in a letter from his then attorney dated August 17, 2022. Counsel argued that the delay of his trial date occasioned by the July 26, 2022 postponement could not be attributed to Carroll's later-filed competency motion.

The court, by the administrative judge who had presided over the July 26, 2022 scheduling conference, denied the motion in a written opinion. It concluded that the July 26, 2022, postponement was the critical postponement, but did not violate Hicks because it was based upon a finding of good cause by the administrative judge. The court wrote:

---

[8] In this appeal, Carroll does not challenge the court's ruling against him on the federal constitutional right to a speedy trial issue.

On May 13th, 2022, at approximately the same time the court's criminal clerk's office received notice from the [S]tate that a jury trial would take between four to five days in this matter, the court's assignment office set the matter in for a one-day jury trial. At the July 26, 2022 scheduling conference it appeared evident that the jury trial then scheduled for one day would need to be continued so that the matter could be set in for five days. With that in mind and the understanding of the State and Defense Counsel, . . . the court on its own initiative found good cause to continue the trial past the *Hicks* date so that the matter could more appropriately be set in for a five-day jury trial. The good cause finding and continuance of the matter was made by [the administrative judge]. Therefore, the postponement of Defendant's trial past the *Hicks* date was made in accordance with Md. Rule 4-271 and [CP] § 6-103 and dismissal of the State's charges against Defendant would not be appropriate.

Though the court did not expressly address the issue, it implicitly exercised its discretion to determine that there was not an inordinate delay.

### c.

On appeal, Carroll asserts that only the November 27, 2022 Hicks date and the July 26, 2022 critical postponement date, that is, the postponement that took the trial date beyond the Hicks date, to May 22, 2023, are relevant. He asserts that, by postponing his trial date from August 25, 2022, to May 22, 2023, almost nine months into the future and nearly six months beyond his Hicks date, the court caused an inordinate delay of the trial "without any objectively reasonable basis for doing so[,]" thereby "violat[ing] [his] right to a speedy trial."

The State responds that there was no Hicks violation because Carroll's August 2022 suggestion of incompetency "pause[d] the Hicks clock." Alternatively, "[e]ven if a competency evaluation did not stop the Hicks clock, complying with the statutory scheme

-19-

for competency evaluations is itself 'good cause to delay the trial beyond the *Hicks* time limit.'" (Quoting *Thompson v. State*, 229 Md. App. 385, 399 (2016).)

**d.**

As a threshold matter, Carroll conflates the Hicks rule with the constitutional right to a speedy trial. In *Tunnell*, our Supreme Court made clear that "the Hicks rule was intended primarily to carry out the public policy favoring the prompt disposition of criminal cases, independent of a defendant's constitutional right to a speedy trial under the Sixth Amendment of the federal Constitution and Article 21 of the Maryland Declaration of Rights." 466 Md. at 571-72. As developed after the Hicks case, the law has come to underscore that the "dismissal sanction that the [Supreme Court of Maryland] has read into the statute and rule must also take account of the public interest in the disposition of criminal cases *on the merits* – whether acquittal or conviction." *Id*. at 588 (emphasis in original). Thus, as "the individual with the most at stake in the disposition of the charges on the merits[,]" the defendant may seek or consent to a postponement of the case beyond the 180-day deadline. *Id*. Likewise, the liberalization of the grounds that may support a good cause finding, including general court congestion, furthers that goal. *Id*. Put simply, although "the speedy trial requirement of the Hicks rule is a mandate that must be complied with at the risk of jeopardizing the prosecution, it is a mandate that must be carried out in a common sense way." *Id*.

With these principles in mind, we turn to the merits. We agree with Carroll as to the relevant dates. The *Tunnell* decision forecloses the State's argument that the Hicks clock was "pause[d]" by the filing of Carroll's suggestion of incompetency. There, the Court

addressed the "misimpression" by the trial court and the prosecutors that the Hicks date was "toll[ed]" during the period of time in which the prosecutors were awaiting DNA analysis results from a lab. *Id.* at 581-82. It pointed out that, although speedy trial laws in many other states provide that certain events will stop and restart the clock, Maryland's statute and rule "do not rely on a system of counting and excluding time periods to determine the deadline for commencing a criminal trial." *Id*. at 583. Rather, as explained above, we set a static benchmark date and allow postponements beyond that date for good cause.

For these reasons, we conclude that Carroll's Hicks date was not altered by subsequent events, including the suggestion of incompetency. It remained November 27, 2022 throughout the proceedings. At issue is whether the postponement of his trial beyond that date requires dismissal of the charges under the circumstances of this case. Specifically, "(1) Was there 'good cause' for the administrative judge to grant a postponement of the scheduled trial date [and] (2) [w]as there an inordinate delay from the scheduled trial date to the new trial date in commencing the trial?" *Id.* at 589.

With regard to the first step of the analysis, Carroll does not directly challenge the good cause finding made by the administrative judge at the July 26, 2022 status conference. In any event, there is sufficient evidence in the record that the initial one-day jury trial date was postponed because the case necessitated five days to try before a jury, not one. Accordingly, the administrative judge did not abuse his discretion by finding good cause to postpone the trial beyond the Hicks date on that basis.

The second step of our analysis involves the length of the postponement. "A case postponed for good cause may yet run afoul of the statute and rule if, after a valid postponement, there is inordinate delay in bringing the case to trial." *Rosenbach v. State*, 314 Md. 473, 479 (1989). "The defendant has the burden of demonstrating that a delay was excessive, in view of all the circumstances of the case." *Tunnell*, 466 Md. at 589. Whether a postponement results in an inordinate delay is reviewed for an abuse of discretion. *Id.*

Carroll takes the position that the nine month postponement from August 25, 2022 to May 22, 2023 was inordinate, and that the analysis of that issue must be based only on what was known at the time the postponement was granted, on July 26, 2022, and nothing more. We disagree. In deciding whether the postponement resulted in an inordinate delay, we can take into account the "circumstances of the case," *id.*, including the intervening event of Carroll's suggestion of incompetency. That intervening event made it impossible for Carroll's trial to commence at any time before October 2023. Consequently, the delay that would have resulted from the July 26, 2022 postponement order was superseded by an independent delay. We explain.

Basic principles of due process prohibit the prosecution of a criminal defendant who is incompetent to stand trial. *Peaks v. State*, 419 Md. 239, 251 (2011). Also, a state must "observe procedures adequate to protect a defendant's right not to be tried or convicted while incompetent to stand trial[.]" *Sangster v. State*, 312 Md. 560, 573 (1988) (citing *Drope v. Missouri*, 420 U.S. 162 (1975)). CP § 3-104(a) implements these protections, providing that:

> If, before or during a trial, the defendant in a criminal case . . . appears to the court to be incompetent to stand trial or the defendant alleges incompetence to stand trial, the court shall determine, on evidence presented on the record, whether the defendant is incompetent to stand trial.

Under the statute, "[o]nce the issue of a defendant's competency has been raised, the proceedings cannot continue until the trial judge determines that the defendant is competent to stand trial beyond a reasonable doubt." *Kennedy v. State*, 436 Md. 686, 692 (2014).

> [A] trial court's duty to determine the competency of the accused is triggered in one of three ways: (1) upon motion of the accused; (2) upon motion of the defense counsel; or (3) upon a *sua sponte* determination by the court that the defendant may not be competent to stand trial.

*Thanos v. State*, 330 Md. 77, 85 (1993).

In the case at bar, both the first and second triggering events occurred in August 2022, when Carroll wrote to the court directly to request a competency evaluation *and* defense counsel moved for a competency evaluation. The court immediately directed MDH to evaluate Carroll's competency. CP §§ 3-105, 3-111. Simultaneously, Carroll entered an NCR plea, and the court, acting within its discretion, also ordered MDH to assess Carroll's criminal responsibility. CP § 3-111.

Once Carroll and his counsel put his competency to stand trial at issue, the case could not move forward until the circuit court determined beyond a reasonable doubt that Carroll in fact was competent to stand trial. The MDH's October 2022 report finding Carroll competent was evidence the court could consider at a hearing to determine Carroll's competence. Because MDH did not complete its assessment of Carroll's criminal responsibility until February 21, 2023, and because Carroll twice was appointed new counsel in the interim, the competency hearing was not scheduled to take place until

-23-

October 2023. On the eve of that hearing, Carroll withdrew his suggestion of incompetence, removing the issue of incompetency to stand trial from the case and making it possible for him to be tried.

As noted, Carroll asserts that, in determining whether "the length of the delay between the postponed trial date and the rescheduled date" was inordinate, we only can take into account circumstances as they existed on July 26, 2022. (Cleaned up.) He relies upon *State v. Brown*, 355 Md. 89, 108-09 (1999), to advance that argument. *Brown* does not support that assertion. In that case, there were many postponements, and in assessing whether there was an inordinate delay, this Court tacked on multiple subsequent postponements after the critical postponement and held that the *total* delay was inordinate and warranted dismissal of the indictment. The Supreme Court held that that was error, and that the issue of inordinate delay only concerns the initial postponement that takes the trial beyond the Hicks date. Postponements beyond the first one past the Hicks date are not relevant.

To be sure, a trial postponement from August 25, 2022, past the November 27, 2022 Hicks date, to May 26, 2023, could be considered inordinate if other, significant circumstances in this case are ignored. As the Court in *Tunnell* made clear, however, the statute and rule as interpreted by Hicks and subsequent caselaw must be carried out in a commonsense way. In this case, that means taking into account, in deciding the issue of inordinate delay, the overriding circumstance that, during the entire relevant period of delay, Carroll's competency to stand trial had been raised but had not yet been decided, precluding a trial. Carroll's due process right to have his competency to stand trial

-24-

determined beyond a reasonable doubt intervened and independently necessitated the continuance of his trial beyond his Hicks date and beyond the date to which the trial had been postponed beyond the Hicks date. The delay occasioned by the July 26, 2022 postponement did not *cause* an inordinate delay in bringing Carroll to trial. It was rendered immaterial by circumstances that independently resulted in the same (and then an even greater) delay. The postponement embodied in the July 26, 2022 did not cause a delay in trial, inordinate or otherwise.[9] Accordingly, the court did not abuse its discretion in denying Carroll's motion to dismiss under Hicks.

**III.**

Finally, Carroll contends the circuit court violated his right to be present at a critical stage of his trial when it held the July 26, 2022 scheduling conference without his being present. The State responds that this issue was waived because Carroll did not ask to be present at the scheduling conference and because his counsel acquiesced in his absence from it. The State maintains that if the issue was not waived, a scheduling conference is not a critical stage of trial and, even if we were to hold otherwise, any error was harmless beyond a reasonable doubt.

---

[9] At oral argument before this Court, counsel for Carroll suggested that, had the July 26, 2022, postponement order not issued, defense counsel may have elected not to raise the issue of Carroll's competency. The record reflects that Carroll wrote his letter to the circuit court prior to learning about that postponement and, as explained, a defendant's request for a competency evaluation triggers the trial court's duty under CP § 3-104(a) even if the defendant is represented by counsel. We also emphasize that a suggestion of incompetence is not a litigation strategy.

We agree that Carroll waived this issue. "In Maryland, a criminal defendant has a common law right to be present at all critical stages of the trial." *State v. Hart*, 449 Md. 246, 264 (2016). This right is implemented by Rule 4-231, which provides that a defendant "is entitled to be physically present in person at a preliminary hearing and every stage of the trial, except (1) at a conference or argument on a question of law; (2) when a nolle prosequi or stet is entered pursuant to Rules 4-247 and 4-248." Md. Rule 4-231(b).

As this Court recently explained in *State v. Robb*, 269 Md. App. 343 (2026), "the defendant's right to be present was, at one time, held to be personal to the accused and could only be waived expressly by the defendant himself." *Id.* at 368 (citing *Hart*, 449 Md. at 265). In *Williams v. State*, 292 Md. 201 (1981), however, our Supreme Court "modified the common law right to permit, under certain circumstances, waiver by counsel in light of modern developments." *Robb*, 269 Md. App. at 368 (quoting *Hart*, 449 Md. at 265).

By Rule, a defendant may waive this right in three ways: (1) by "voluntar[y] absen[ce] after the proceeding has commenced, whether or not informed by the court of the right to remain"; (2) by "engag[ing] in conduct that justifies exclusion from the courtroom"; or (3) by "*personally or through counsel, agree[ing] to or acquiesc[ing] in being absent*." Md. Rule 4-231(c) (emphasis added). Only the third method of waiver is applicable here.

When Carroll testified at the second hearing on his motion to dismiss, he introduced into evidence as an exhibit a notice of the July 26, 2022, scheduling conference that he received. That scheduling conference was requested by defense counsel, but there is no evidence that he requested his client's presence at it or objected to his client not appearing

either during the conference or after it was held. In its written opinion denying the motion to dismiss, the court found as a fact that defense counsel did not request his client's presence at the scheduling conference. Because defense counsel acquiesced in Carroll's absence from the scheduling conference, his right to be present, if any, was waived.

**JUDGMENTS OF THE CIRCUIT COURT FOR WASHINGTON COUNTY AFFIRMED. COSTS TO BE PAID BY THE APPELLANT.**